**LOCAL UNION 13410, UNITED MINE WORKERS OF AMERICA, Plaintiff,**

v.

**UNITED MINE WORKERS OF AMERICA, Edward L. Carey, United Mine Workers of America Welfare and Retirement Fund, National Bank of Washington, and Hamilton Leasing Corporation t/a Manger Hamilton Hotel, Defendants.**

**Civ. A. No. 2778–70.**

United States District Court,
District of Columbia.

March 30, 1971.

James P. Donovan, Jack H. Olender, Washington, D. C., for plaintiff.

Walter E. Gillcrist, Washington, D. C., for defendant United Mine Workers of America and Edward L. Carey.

Harold H. Bacon, Washington, D. C., for defendant United Mine Workers of America Welfare and Retirement Fund.

Jo V. Morgan, Jr., Whiteford, Hart, Carmody & Wilson, Washington, D. C., for defendant National Bank of Washington.

Allen Jones, Jr., Wilkes & Artis, Washington, D. C., for defendant Hamilton Leasing Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIRICA, District Judge.

This matter is before the Court on plaintiff's action for a temporary restraining order, preliminary and perma-

nent injunction, and damages. Plaintiff alleges, basically, that defendants have interfered with the internal affairs of the plaintiff union and with the free exercise of its members' rights. The Court heard and granted plaintiff's request for a temporary restraining order on September 18, 1970. On October 2, 1970, the Court heard argument and testimony on plaintiff's prayer for a preliminary injunction. Further argument and testimony were heard on November 13 and 14, 1970, and the parties agreed that the Court should consider the plaintiff's prayer for a permanent injunction. The question of damages, if any, was deferred for later consideration, if necessary [TR Vol. 2, pp. 136–137].

Upon consideration of all of the above, including the memoranda submitted by counsel for plaintiff and defendants, as to the plaintiff's prayer for a permanent injunction, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Plaintiff, Local Union 13410, United Mine Workers of America, and defendant, International Union, United Mine Workers of America, are both labor organizations and maintain their principal place of business in Washington, D.C. They will hereinafter be referred to as "Local Union" and "International Union." Defendant Edward L. Carey is general counsel for the International Union.

2. Defendant United Mine Workers of America Welfare and Retirement Fund is a Trust, created pursuant to Section 302(c) (5), Labor Management Relations Act, 1947 (commonly known as the Taft Hartley Act), 29 U.S.C. § 186(c) (5), and will hereinafter be referred to as "Fund." One Trustee is appointed by the International Union, one Trustee by the bituminous coal operators signatory to the National Bituminous Coal Wage Agreement of 1950, the amendments thereto, and the National Bituminous Coal Wage Agreement of 1968, and a third and neutral Trustee, appointed by the other two Trustees. The three Trustees now administering the Fund are W. A. Boyle, appointed by the International Union, C. W. Davis, appointed by the signatory bituminous coal operators, and Josephine Roche, the neutral Trustee, selected by the other two Trustees. The Fund is concerned with paying benefits, pursuant to resolutions and regulations, to beneficiaries in the coal industry.

3. The defendant National Bank of Washington [hereinafter the "Bank"] is a banking and financial institution in the District of Columbia.

4. The defendant Hamilton Leasing Corporation t/a Manger Hamilton Hotel [hereinafter the "Hotel"] is engaged in furnishing public accommodations and lodgings in the District of Columbia.

5. The plaintiff Local Union represents the employees of the defendant Fund in Washington, D.C. and in the ten area medical offices of the Fund located substantially away from Washington, D.C. [TR Vol. 1, p. 60]. In addition, there are members of the Local Union who are employees of the Appalachian Regional Hospital and the Dr. Thomas Walker Memorial Health Foundation, Inc., located in West Virginia [TR Vol. 1, p. 61; TR Vol. 2, pp. 5, 6, 91; Defendant Int. Union Exhibit 7].

6. The plaintiff Local Union dissaffiliated from District 50 [TR Vol. 2, p. 11] and affiliated with the International Union in 1968 [TR Vol. 2, pp. 147–148].

7. The Constitution of the International Union, [Plaintiff's Exhibit 2] Article II, provides:

### OBJECTS

First. To unite in one organization, regardless of creed, color or nationality, all workers eligible for membership, employed in and around coal mines, coal washeries, coal processing plants, coke ovens, and in such other industries as may be designated and approved by the International Execu-

tive Board, on the American Continent.

Article XIV, Section 1 of the Constitution of the International Union provides:

Local unions shall be composed of ten or more workers, skilled and unskilled, working in or around coal mines, coal processing plants, coke ovens, or in other industries designated and approved by the International Executive Board, but seven members shall be a quorum for a Local Union.

Article III, Section 2 of the Constitution provides:

All Districts, Sub-Districts and Local Unions must be chartered by, and shall be under the jurisdiction of and subject to the laws of the International Union and rulings of the International Executive Board * * *.

8. The International Union gave a charter to the Local Union as an affiliate in 1968 [TR Vol. 2, pp. 147–148] and on January 20, 1970, the International Executive Board enacted a resolution approving and ratifying the issuance of charters to certain local unions, including specifically the plaintiff Local Union [Defendant International Union's exhibit 12].

9. On August 4, 1970, a National Labor Relations Board Trial Examiner issued a decision in case number 27–CA–2607, finding that the employer Fund was interfering in the exercise of its employees' rights and in the administration of the Local Union in violation of Sections 7 and 8(a) (1) and (2) of the Labor Management Relations Act, 1947, 29 U.S.C. §§ 157 and 158(a) (1) and (2). Specifically, the Trial Examiner found that by the conduct of some of the Fund's supervisors in holding the position of and carrying out the duties of corresponding secretary of the Local Union, by voting in union elections, by calling, by soliciting and procuring union membership and union dues checkoff authorizations, the Fund was interfering in Local Union matters. The Examiner also found that the Local Union, by rea-

son of its relationship to the International Union and to the Fund, was incompetent to represent the employees of the Fund because of a conflict of interest inherent in that relationship which prevented the Local Union from exercising the single-minded purpose of protecting and advancing the interests of the employees it represents.

The Trial Examiner issued a recommended order, which is subject to appeal and the final order of the National Labor Relations Board, that the employer Fund cease participating in Local Union business and withdraw all recognition from the Local Union as the representative of its employees and stop deducting money from its employees' wages for payment to the Local Union. The employer Fund was ordered to put up a notice in its Washington office to the effect that the employer was withdrawing recognition of the Local Union as the collective bargaining agent of its employees [Exhibit A to the complaint: National Labor Relations Board Trial Examiner's Decision, Case No. 27–CA–2607, August 4, 1970, pp. 17–18].

10. On August 25, 1970, the president of the Local Union promulgated notice of the regular membership meeting of the Local Union, to be held on August 28, 1970 at the Hotel in Washington, D. C. The notice referred to the recommended order of the Trial Examiner and stated that certain steps would have to be taken to remove the conditions which brought about the Trial Examiner's recommendations. The questions of continued affiliation with the International Union, the removal from membership of those persons considered as supervisors and the disposition of the current Local Union Death Benefit Fund were designated in the notice as discussion items for the membership meeting [Defendant International Union exhibits 3 & 4].

11. On August 28, 1970, the date of the regular membership meeting, the Local Union was composed of approximately four hundred sixteen members. Approximately one-half of the membership was employed in the Washington, D.C.

offices of the defendant Fund [TR Vol. 1, p. 60] and approximately one-half in the ten area medical offices of the Fund, the Appalachian Regional Hospital and the Thomas Walker Clinic, in locations away from Washington, D.C. [TR Vol. 1, pp. 60–61].

12. At the membership meeting of August 28, 1970, the Executive Committee of the plaintiff Local Union submitted to the members present at the meeting a resolution to disaffiliate from the International Union and to be known under a different name, and also to separate the Local Union Death Benefit Fund from the Local Union. The minutes of the meeting indicate that the Executive Committee had also made a decision regarding those people who would "no longer be eligible for membership," [Defendant International Union exhibit 5] and the resolution stated that the current Death Benefit Fund now included as members "supervisors or others who are ineligible for membership in the [Local] Union * * *." Those members present at the meeting voted in favor of submitting the resolution to the membership for vote by secret mail ballot [TR Vol. 1, p. 38].

13. The ballot was mailed to 358 members of the Local Union. An additional 58 members were not sent ballots because the Local Union had decided that these members were ineligible for membership as supervisors, or were otherwise "exempt" [TR Vol. 1, pp. 38–39]. The mailing deadline for the return of the ballots was September 14, 1970, and they were to be counted on September 21, 1970 [TR Vol. 1, p. 40].

14. The mailed ballot contained the proposed resolution, a ballot, and a covering letter. The covering letter identified the resolution and contained this statement: "The Resolution is clear regarding the Legal impediments existing and the remedies necessary." The letter also gave the mechanical instructions for marking the ballot and returning it by mail. The ballot itself provided two boxes, one for a "yes" vote to the provisions of the enclosed resolution, one for a "no" vote. Thus, the voter was required to vote either "yes" or "no" as to both the disaffiliation from the International Union and as to the separation of the Local Union Death Benefit Fund. A voter could not vote "yes" on one provision and "no" on the other [Defendant International Union exhibits 6, 11, & 10].

15. In 1956, the Local Union established a Death Benefit Fund [TR Vol. 2, p. 151] into which the members of the Local Union paid a monthly sum. Out of this Death Benefit Fund, a lump sum payment was made to designated beneficiaries upon the death of a member. The sole qualification for eligibility to receive the payment was that the decedent must have been a member in good standing of the Local Union at the time of his death [Defendant International Union exhibit 13]. Those fifty-eight members of the Local Union who were not sent a ballot did not have an opportunity to vote on that provision of the proposed resolution pertaining to the separation of the Death Benefit Fund, although they had paid into it.

16. On September 2, 1970, the aforesaid fifty-eight individuals were advised by a letter from the president of the Local Union " * * * that the [Local] Union has been informed you are not eligible for membership because of your supervisory or exempted position with your employer." The letter stated that such action was necessary under the Labor Management Relations Act as held in Case Number 27–CA–2607 wherein the Trial Examiner concluded that participation by supervisors and other exempted employees in the Local Union violated the Act. The president's letter invited the named individuals to advise the president in writing if they felt that they did not occupy a supervisory or exempted position, so that the matter of their eligibility might be reconsidered [Defendant International Union exhibit 8].

17. On September 10, 1970, a letter signed by seven of the fifty-eight affected members was sent to the president of

the Local Union and a copy forwarded to the General Counsel of the International Union. The letter protested the action of the Local Union disqualifying them from membership and also the attempt to disaffiliate the Local Union from the International Union [Defendant International Union exhibit 9].

18. No hearing was held by the Local Union on the issue of the eligibility for membership of these fifty-eight members [TR Vol. 2, pp. 165, 166].

19. On September 17, 1970, W. A. Boyle, the president of the International Union appointed a commission of three members of the Executive Board of the International Union to make an investigation of the Local Union's action of declaring fifty-eight of its members ineligible for membership [TR Vol. 2, pp. 181–182].

20. On that date, W. A. Boyle, the president of the International Union issued an order revoking the charter of the Local Union and establishing a provisional government of the Local Union. Two members of the Local Union were appointed trustees. The order further provided that upon any appeal being noted by a deposed officer or member affected in the Local Union, a hearing would be held before the International Executive Board at the earliest opportunity. The order set forth certain findings by the president of the International Union, and a conclusion that "democratic procedures in [the Local Union] have been violated, and that there is immediate need of correcting the same, and that such may be done and the rights of all members of said Local Union protected only by the establishment of a trusteeship over [the Local Union] in accordance with Subchapter IV of the Landrum-Griffin Act, 29 U.S.C. §§ 461–466 * * * " [Defendant International Union exhibit 1].

21. The Constitution of defendant International Union, Article III, Section 2, provides:

* * * Charters of Districts, Sub-Districts and Local Unions may be re-voked by the International President, who shall have authority to create a provisional government for the subordinate branch whose charter has been revoked. This action of the International President shall be subject to review by the International Executive Board upon appeal by any officers deposed or any members affected thereby. Until such review is had and unless said order of revocation is set aside, all members, officers and branches within that territory affected by the order of revocation shall respect and conform to said order. An appeal may be had from the decision of the Executive Board upon such order of revocation, to the next International Convention.

22. On September 18, 1970, plaintiff Local Union filed the instant action and on the same date the Court entered a temporary restraining order against defendants to cease and desist interfering in plaintiff's affairs and to release plaintiff's ballot box and monies which were held by defendants Hotel and Bank respectively. That temporary restraining order, by agreement of counsel, continues in effect until the decision in this matter. The temporary restraining order prevented any hearing from being held by the International Union's Executive Board on the factual issues raised by the trusteeship.

23. On September 18, 1970, plaintiff Local Union had monies on deposit with defendant Bank in four accounts [TR Vol. 2, p. 27].

24. On that date, the defendant Bank received a copy of the order from the president of the International Union revoking the charter of the Local Union and indicating that plaintiff's officers had been removed from office and trustees had been substituted as officers of the Local Union [TR Vol. 2, pp. 32–34].

25. On the afternoon of September 18, 1970, in answer to plaintiff Local Union's question whether plaintiff's account at defendant Bank would be frozen, the Bank answered that it would

freeze the account, and await the advice of its own counsel [TR Vol. 2, pp. 29–33].

26. Later in the afternoon of September 18, 1970, counsel for the Bank informed the Bank that a temporary restraining order had been issued and that the Bank should not freeze the plaintiff's account [TR Vol. 2, p. 28].

27. No evidence has been offered that the Local Union presented any check to the Bank for payment or made any withdrawal request on September 18, 1970, and there has been no evidence of a dishonor of any check or withdrawal request [TR Vols. 1 & 2].

28. There is no evidence that either before or after September 18, 1970, the defendant Bank dishonored any check or withdrawal request made by the Local Union [TR Vols. 1 & 2].

■ 29. The action taken by the Bank on September 18, 1970, was reasonable in light of the imposition of the trusteeship on the Local Union by the president of the International Union, and the surrounding circumstances [TR Vol. 2, pp. 25–35].

30. Plaintiff Local Union has withdrawn in open court its request for injunctive relief against the Bank, the Bank having indicated that it will abide by the final order of this Court as to who are the proper persons to act for the Local Union with respect to said monies [TR Vol. 2, pp. 216, 217–218].

31. The defendant Hotel, pursuant to an agreement with plaintiff, had in its possession on September 18, 1970, a box furnished by plaintiff Local Union in which returning ballot mail from members was to be placed. On that date a representative of the Local Union and one of the trusteeship trustees each demanded delivery of the box. A representative of the Hotel responded that it would not surrender the box and mail until there was an appropriate court order directing that it do so [TR Vol. 2, p. 50].

32. On September 21, 1970, the defendant Hotel was served with the temporary restraining order of this Court which directed the Hotel to release to the plaintiff the aforementioned box and ballots, which the Hotel did [TR Vol. 2, p. 50].

■ 33. This Court finds that the action of the Hotel in retaining the aforesaid box and ballots until an appropriate court order was entered was reasonable in light of the circumstances. The plaintiff Local Union has withdrawn its request for injunctive relief against the defendant Hotel [TR Vol. 2, p. 217].

34. The Teller Committee of the plaintiff Local Union counted the ballots the evening of September 21, 1970, under the supervision of a notary and with members observing [TR Vol. 1, pp. 40–41; Vol. 2, pp. 50–56]. Results of the secret ballot were 221 votes for disaffiliation and separation of the Death Benefit Fund and 33 votes against. However, the Teller Committee inadvertently counted 18 ballots in envelopes bearing no postmarks, and, on the advice of counsel, the 18 votes were deducted from the affirmative vote, leaving an affirmative vote of 203 [TR Vol. 1, p. 42; Plaintiff's exhibits 17 & 18].

■ 35. The Court finds insufficient evidence upon which to base a conclusion that commencing August 28, 1970, the defendant Fund and the Trustees thereof, in conspiracy or concert with defendants Edward L. Carey, the International Union, the Bank or the Hotel coerced or frightened "members of the plaintiff [Local] Union from exercising their lawful prerogative to vote" on the question of disaffiliation from the International Union; acted to " 'freeze' and impound the bank deposits of plaintiff at defendant Bank without plaintiff's knowledge"; acted to "cause the defendant Hotel to refuse to relinquish and turn over to plaintiff plaintiff's secret ballots and ballot box" ; assisted or acted in any way to establish "a provisional local to take over the operation of said plaintiff," as alleged in

**1114**

paragraphs 3, 4 and 5 of the complaint in the instant case.

### CONCLUSIONS OF LAW

1. Plaintiff, Local Union, was validly chartered by defendant International Union, in that plaintiff was "designated and approved by the International Executive Board" as authorized under Article II, First, and Article XIV, Section 1 of the Constitution of the International Union.

2. The Constitution of the International Union, Article III, Section 2, expressly authorizes its president to revoke the charters of local unions and establish provisional governments over the subordinate branch whose charter has' been revoked.

■ 3. Section 302 of the Labor-Management Reporting and Disclosure Act of 1959 (commonly known as the Landrum-Griffin Act), 29 U.S.C. § 462 provides:

> Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of * * * restoring democratic procedures * * * or otherwise carrying out the legitimate objects of such labor organization.

This section places limitations upon the right of labor organizations to place their subordinates in trusteeship, requires that in both the establishment and administration of trusteeships the governing constitution be obeyed, and limits the permissible purposes for trusteeships. The section does not, however, say that constitutions must contain procedures to be observed in establishing a trusteeship, as plaintiff Local Union argues they must. The Secretary of Labor, in his report to Congress in September, 1962, took the position that the Section did not require them to do so:

> The Department has taken the position that the procedure to be followed in the establishment * * * of a trusteeship would not have to be set forth in the constitution or bylaws as a prerequisite for a valid trusteeship; but in all cases the procedure actually followed would have to be consistent with whatever provisions the constitution or bylaws do in fact contain. Union Trusteeships, Report to the Congress by the Secretary of Labor, 36 (1962).

■ Section 304(c) of the Act, 29 U. S.C. § 464(c) provides a presumption of validity for eighteen months for "a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing * * *." However, to sustain plaintiff's argument that the Constitution of the International Union must contain procedures for establishing trusteeships would require a finding that Congress intended to limit the presumption of validity to trusteeships established under constitutions which go beyond the requirements of Section 302. This Court does not make such a finding and concludes that the trusteeship in the instant case was properly established by the International Union.

4. The trusteeship imposed by the defendant International Union on the plaintiff Local Union on September 17, 1970, was imposed for a valid purpose, pursuant to Section 302 of the Act, 29 U.S.C. § 462, that is, to restore democratic procedures. Documentary evidence clearly establishes that fifty-eight members of the Local Union were declared ineligible for membership in said Local Union. This declaration of ineligibility was made on the basis that the fifty-eight members were supervisors or otherwise exempt, although written specific charges, a reasonable time to prepare their defense and a full and fair hearing were not accorded the affected members, contrary to their statutory rights to these safeguards under Section 101(a) (5) of the Act, 29 U.S.C. § 411(a) (5).

5. Even if the fifty-eight members declared ineligible for membership were in fact supervisors, their right to continued membership in the Local Union is guaranteed by Section 14(a) of the Labor Management Relations Act, 1947, (commonly known as the Taft-Hartley Act) 29 U.S.C. § 164(a), which provides in pertinent part:

Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

6. The unilateral declaration of ineligibility for membership of fifty-eight individuals constituted a basic breakdown of democratic procedures in the Local Union. The imposition of a trusteeship by the International Union in order to restore democratic procedures was valid and in accordance with the Constitution of the International as well as Section 302 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 462.

7. The imposition of the trusteeship of the Local Union by the International Union occurred while the Local Union was still subject to and affiliated with the International Union. The secret mailed ballot referendum conducted by the Local Union was invalid for several reasons:

(a) The resolution which was submitted to the membership contained two propositions, yet the ballot permitted the member to register only one "yes" or "no" vote. Clearly, there should have been a "yes" or "no" vote as to each proposition which was submitted to the membership.

(b) In view of the fact that one of the propositions contained in the mailed ballot referendum dealt with the Local Union Death Benefit Fund, in which the fifty-eight individuals declared ineligible for membership had a vested interest, said fifty-eight individuals were entitled to vote on that proposition. The failure to permit them to so vote renders the mailed ballot referendum invalid. It is not necessary for the Court to decide whether all or any one of the fifty-eight individuals declared ineligible for membership were entitled to vote on the proposition of disaffiliation.

(c) It is consistent with Congressional intent that all union elections be conducted in the fairest way possible. Labor-Management Reporting and Disclosure Act of 1959, Sections 401 and 402, 29 U.S.C. §§ 481, 482. The referendum mailed ballot sent to each member contained the proposed resolution which in itself contained two propositions. The resolution, however, contained a number of "Whereas" clauses, which constituted political campaign literature favoring a "yes" vote. Furthermore, the letter enclosed in the mailed ballot sent to each member contained the statement that the resolution to be voted on was "clear regarding the Legal impediments existing and the remedies necessary." This statement also constituted improper campaign literature suggesting a "yes" vote.

(d) It should also be pointed out that at least half of the membership of the Local Union works and resides at a substantial distance from Washington, D. C., were meetings of the plaintiff are held. The Local Union gave notice of the holding of a meeting to determine whether a mailed ballot referendum should be submitted to the membership with only three days notice. It would seem highly unlikely that one-half of the membership located substantially away from Washington, D. C. would in fact be able to attend the voting at said meeting with the little notice that was in fact given.

8. Section 304(c) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 464(c), requires that a hearing on the imposition of the trusteeship be held. The trustee-

ship must be "authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution * * *." The language "authorized or ratified" permits the conclusion that the required hearing may be held after the trusteeship has been imposed. The order imposing the trusteeship in this case clearly sets forth that a hearing would be held at the earliest available opportunity before the International Union's Executive Board. Plaintiff would be entitled to relief, in the future, if a fair hearing is not subsequently held.

9. There is no longer any application for nor any need for injunctive relief against the Bank or against the Hotel.

For the foregoing reasons, this Court concludes that plaintiff's prayer for a permanent injunction should be denied. Counsel will submit an appropriate order.