**LOCAL UNION 13410, UNITED MINE WORKERS OF AMERICA, Appellant,**

v.

**UNITED MINE WORKERS OF AMERICA et al.**

**No. 71–1272.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1972.

Decided Jan. 5, 1973.

Mr. Jack H. Olender, Washington, D. C., with whom Mr. James P. Donovan, Washington, D. C., was on the brief for appellant.

Mr. Harold H. Bacon, Washington, D. C., for appellee, United Mine Workers of America, Welfare and Retirement Fund.

Mr. Charles L. Widman, Washington, D. C., for appellees, United Mine Workers of America and Edward L. Carey.

Mr. Jo V. Morgan, Jr., Washington, D. C., with whom Mr. John J. Wilson, Washington, D. C., was on the brief, for appellee, The National Bank of Washington.

Mr. Allen Jones, Jr., Washington, D. C., for appellee, Hamilton Leasing Corporation.

Before FAHY, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Appellant is a local labor organization composed of clerks, medical assistants and hospital clerks. The members of the Local are employed in various clerical and administrative capacities by the United Mine Workers of America Welfare and Retirement Fund.[1] In turn the Fund is partially controlled by and receives a substantial portion of its assets from members of the United Mine Workers of America, an international labor union and appellee herein. The net result was that members of the Local were indirectly but essentially employed by the organization [International] which was supposed to represent them against their employer [Fund], an interrelationship which continued for twenty years.

### I. Actions of the Trial Examiner and District Court

Twenty years was sufficient to bring this situation to the attention of the ever-watchful National Labor Relations Board. After hearing a Trial Examiner found that the employer (Fund) was engaged in unfair labor practices with respect to the Local.[2] A major basis for this finding was the participation of supervisory personnel of the Fund in the affairs of the Local. The Trial Examiner also found that the Local was disqualified to represent the Fund's employees by reason of the Local's affiliation with the International. Since the Fund's payroll goes to the employees which the International represents, and the International helps to name the Fund's trustees, the Trial Examiner found an unacceptable conflict of interest to exist.

After posting the required notice, the Local met to consider the effect of the Examiner's decision. The remedial action decided upon was to take a secret ballot on a resolution providing for both disaffiliation from the International and separation of the Local's Death Benefit Fund. Based on the Examiner's opinion, fifty-eight alleged supervisory personnel were notified of their purported

1. The Fund is a trust, created pursuant to Section 302(c)(5), Labor-Management Relations Act of 1947, 29 U.S.C. § 186(c)(5) (1970). One trustee is appointed by the bituminous coal operators signatory to the National Bituminous Coal Wage Agreement of 1968, a second by the International, and a third trustee by the other two trustees. The three trustees administering the Fund at all times relevant herein were W. A. Boyle, appointed by the UMWA, who is also the president of the UMWA; C. W. Davis, appointed by the signatory bituminous coal operators; and Josephine Roche, selected by the other two trustees, who also acted as Director of the Fund.

2. UMWA Welfare and Retirement Fund, No. 27-CA-2667 (4 Aug. 1970) (reprinted in Joint App., Vol. I at 22.)

ineligibility for membership and were thus not allowed to vote on the resolution.

Alleging that the disqualification of the supervisors and various other .acts constituted a breakdown in democratic procedures, the International placed the Local under a trusteeship. This trusteeship froze the Local's bank account, impounded the ballots on the disaffiliation resolution, and took over management of the Local's affairs. The Local responded by bringing suit against the International seeking a temporary restraining order, followed by a preliminary and permanent injunction, and damages.[3] The District Court granted the temporary restraining order and permitted the ballots to be counted, revealing that the resolution to disaffiliate had passed by the decisive margin of 203 to 33. After trial on the merits, the District Court found for the International, holding the disaffiliation vote to be invalid and denying preliminary and permanent injunctions and the request for damages.[4]

The Local now seeks reversal of this action of the trial court.

■ The Local argues that the passage of the disaffiliation resolution effectively disassociated the Local from the International, and therefore a permanent injunction is justified to prevent meddling by the International in the affairs of the now unrelated Local.[5] The trusteeship, however, was imposed before the disassociation became effective, and was specifically intended to prevent the disaffiliation of the Local. If the trusteeship was valid, the vote for separation came too late to be effective. The validity of the trusteeship is thus the principle issue upon which this dispute turns.[6]

## II. The Actions of the Local

The Labor-Management Reporting and Disclosure Act provides that a labor organization shall impose a trusteeship over a subordinate body for certain specified purposes, including "restoring democratic procedures."[7] The Interna-

3. Joint liability for damages, and further injunctive relief, were claimed against (1) the National Bank of Washington for allegedly "freezing" the Local's funds upon receipt of notice of the trusteeship, (2) Hamilton Leasing Corporation for failing to turn over the ballot box to the Local without a court order, and (3) the Fund for allegedly conspiring with the International to interfere with the internal affairs of the Local. The District Court dismissed the Local's claims as to these parties. On this appeal the Local has made no real attempt to show that this holding by the District Court as to these three defendants was improper. After argument we therefore affirmed from the bench the District Court's dismissal as to the Fund, the National Bank of Washington, and the Hamilton Leasing Corporation. Order and Judgment, No. 2778-70, 3 Nov. 1972.

4. Local Union 13410, UMWA v. United Mine Workers of America, 325 F.Supp. 1107 (1971).

5. The Local also argues that the trusteeship is invalid because the International's constitution does not include specific provisions on either the procedure or the grounds for imposing a trusteeship. Despite the lack of such requirement in the statute, a few cases in other jurisdictions

have intimated that specific provisions are necessary. United Bhd. of Carpenters and Joiners of America v. Brown, 343 F.2d 872, 883 (10th Cir. 1965); Local No. 2, Int'l Bhd. of Tel. Workers v. Int'l Bhd. of Tel. Workers, 261 F.Supp. 433, 434–435 (D.Mass.1966). Still other jurisdictions have held to the contrary. Luggage Workers U. Local 167 v. Int'l L. G., P. & N. W. U., 316 F.Supp. 500, 504–505 (D.Del.1970); Int'l Bhd. of Elec. Workers, Local 1186 v. Eli, 307 F.Supp. 495, 503 (D.Hawaii 1969). Since we find for the Local on other grounds, we do not decide this important issue in this opinion.

6. The International argues that the Local has failed to exhaust its intra-union remedies and has not therefore complied with 29 U.S.C. § 464(a) (1970). In light of the reasons given to justify the action taken by the International, and which officials took the action, it is obvious that attempts at intra-union adjudication would have been futile. Under such circumstances the Local is not obligated to exhaust every possible intra-union avenue of relief. See, e. g., Parks v. Int'l Bhd. of Elec. Workers, 314 F.2d 886, 924–925 (4th Cir. 1963).

7. 29 U.S.C. § 462 (1970).

tional claims that the Local abrogated "democratic procedures" by three specific courses of action.

## A. *Expulsion of Members*

■ The International first claims that the notice to fifty-eight supervisory employees stating that the Local had "been informed" of their ineligibility for membership was an illegal expulsion.[8] The letter's language and the surrounding circumstances, however, suggest that no members were expelled by this or any other act of the Local prior to imposition of the trusteeship. There is evidence that the supervisory employees were not in fact taken off the membership rolls of the Local.[9] In addition, they were given an opportunity to appeal their classification; this suggested that no final action had been taken.[10]

■ The International protests that requirements under 29 U.S.C. § 411(a)(5) of specific charges, time to prepare a defense, and full and fair hearing were not met. The section relied upon, however, is entitled "Safeguards against improper disciplinary action" and provides that "no member . . . may be . . . expelled, *or otherwise disciplined*" [11] without the enumerated safeguards. Even assuming the Local had taken final action to expel the supervisors, that action was not *disciplinary* in nature. The supervisory personnel were not being removed in order to punish them but rather to comply with a decision of the NLRB Examiner. The Local was not obligated to conform to the *specific* provisions of § 411(a)(5).

■ Strictly speaking, the Local may not have been obligated to expel the supervisors since such individuals may be non-voting members of unions.[12] The Local could have simply amended its bylaws to provide for this special non-voting status. As noted, however, the supervisors were not actually expelled by the letter. Indeed, they were specifically invited to show why they ought not to be expelled.[13] The supervisors could have raised the possibility of a non-voting membership at that time. The Local's notice, therefore, met the minimum standards required by due process under the circumstances.

## B. *Denial of Vote to Supervisors*

■ The tangible and final action which the Local did take with respect to the fifty-eight supervisors was barring them from voting on the disaffiliation resolution. This provides no basis whatever in support of the International's position. First, the NLRB Examiner's decision, as it then stood and as it was later adopted with modifications by the Board, specifically provided that voting by such supervisors was improper.[14] Second, even a unanimous vote by the fifty-eight against the resolution would still not have defeated it. Third, the Local's Death Benefit Fund, in which the supervisors had an interest, was merely separated, not dissolved. No pecuniary interest of the supervisors was threatened by that action; in fact, if the supervisors were not to remain members of the Local, separation of the Fund was desirable to protect the supervisors' financial interest.

---

8. The letter is reprinted in Joint App., Vol. III at 550.

9. In a letter to one of the supervisors the president of the Local said, "I would like to advise you again that you remain on the membership rolls of this Union." ·Letter from Robert A. Olds to Harold H. Bacon, 9 Nov. 1970, Joint App., Vol. III at 476.

10. The letter to the 58 supervisors said: "If you feel you do not occupy a position that is supervisory or exempt in nature, I would appreciate you advising me in writing your reasons so that we might

re-consider your eligibility." Letter from Local President Robert A. Olds to 58 Supervisory Personnel, Joint App., Vol. III at 550.

11. 29 U.S.C. § 411(a)(5) (1970).

12. 29 U.S.C. § 164(a) (1970).

13. *See* note 10, *supra.*

14. UMWA Welfare and Retirement Fund, No. 27–CA–2607 (4 Aug. 1970) (reprinted in Joint App., Vol. I at 22, 38), modified in part, 192 N.L.R.B. No. 120 (25 Aug. 1971).

Thus, the only possible result of permitting the supervisors to vote would have been to invalidate the entire ballot by violating the Examiner's order, and creating a greater potential of disqualification of the Local as bargaining representative of the non-supervisory employees. To accede to the International's claim would have required the Local to maintain union democracy by allowing what the NLRB had found to be an unfair labor practice. The Local's good faith attempt to comply with the law cannot be used by the International as the basis for imposition of a trusteeship.

### C. Other Claimed Procedural Defects

The International claims the meeting following the Hearing Examiner's decision was called with inadequate notice to the farflung membership of the Local. Inasmuch as the posted notice complies precisely with the Local's by-laws,[15] the International has been unable to illustrate what more could be required of the Local.

■ A further claim charges that the resolution contains two separate clauses (disaffiliation from the International and separation of the Death Benefit Fund) but allowed only one "yes" or "no" vote. Aside from the International's inability to cite any authority for the proposition that joint resolutions of this type are impermissible, this court finds it difficult to describe a procedure regularly followed in Congress as a breakdown in the democratic process. In any event, if the resolution for disaffiliation had carried, and the supervisors under the NLRB decision were no longer to be members of the Local, it was necessary to separate the Death Benefit Fund from purely Local administration to protect the interests of the non-member supervisors. The possibility of inconsistent votes on the two related questions was wisely not allowed.

■ Finally, the International objects to language within the resolution and accompanying it which can arguably be described as advocacy for passage of the resolution by the Local's leadership.[16] Admittedly the challenged language does not go out of its way to point out that the Trial Examiner's decision on the need to disaffiliate might not be the final NLRB action. Someone had to send out the ballots and characterize the issues, however. Absent an outright distortion of the facts and issues as reasonably perceived, we shall not presume that the Local's characterizations and comments on the issues were improper.

### D. An Injunction Against Future Interference

■ In short, no valid factual basis existed for the International's conclusion that "democratic procedures" had been abrogated. The District Court erred in holding that a breakdown in democratic procedures, requisite to establish a valid purpose for the trusteeship, had occurred in this case. What broke down —and for perfectly valid and understandable reasons—was support in the Local for continued affiliation with the International. The real (and invalid) purpose behind the International's imposition of the trusteeship was its desire to retain control of the Local's affairs. This clearly justifies a permanent injunction to prevent the International from interfering further with the affairs of the Local.

### III. The Initial Validity of the Trusteeship

■ Our discussion in Part II illustrates that there was in fact no reason to permit the International to impose a trusteeship on the Local. This issue of the initial validity of the trusteeship is important in this case because the Local is asking that its vote to disaffiliate from the International be held valid and that the International be assessed dam-

15. Joint App., Vol. III at 479.

16. The disaffiliation resolution was phrased with a number of "Whereas" clauses. The resolution is reprinted in Joint App., Vol. III at 546.

ages for the harm done the Local as a consequence of the trusteeship. If the trusteeship was unlawfully imposed, it could have no effect upon the validity of the disaffiliation election. The Local should also be permitted to recover whatever monetary damages it suffered due to the wrongful imposition of the trusteeship.

Most obviously, the imposition of the trusteeship would be invalid if at the time of the imposition there was no rational basis for the International's belief that democratic procedures were in jeopardy. Under the circumstances as they appeared at the time, the International's assertion that democratic procedures in the Local were endangered appears more as an afterthought justifying abrupt and arbitrary action taken. While the letter informing the supervisory personnel of their ineligibility to vote might have led the International to conclude that some of its members might *eventually* be expelled from the Local without any valid justification derived from NLRB action, yet the letter clearly invited response from the supervisors affected. The implicit promise of further consideration by the Local hardly provided a legal justification for the precipitate takeover by the International through the frequently abused device of a trusteeship. The purported apprehensions of the International have been shown to be legally incorrect; on this ground alone the establishment of a trusteeship by the International would have been invalid, but to our mind an even stronger reason exists for invalidating the trusteeship.

IV. *Failure to Provide for a Hearing*

The Local advances a second basis for holding the trusteeship to have been invalid. This claim relies upon the fact that the trusteeship was imposed without giving the Local an opportunity for a hearing. Such a hearing is arguably required by the language of 29 U.S.C. § 464(c), and indubitably would have been helpful in this situation, since a hearing would have given the Local an opportunity to explain that no one was actually being expelled. Once reassured, the International would no longer have had an arguable basis for believing that a trusteeship was necessary. Thus the International's failure to afford the Local a chance to be heard prejudiced the Local by depriving it of an opportunity to remove the purported basis for the International's belief that democratic procedures had broken down. If the International was required to allow a hearing and did not do so, the imposition of the trusteeship must be held invalid.

The section relied upon by the Local does not, by its specific terms, make a hearing mandatory whenever a trusteeship is imposed.[17] Upon superficial examination the statute seems simply to say that a trusteeship will be presumed valid *if a hearing is held*—not that a trusteeship will be invalid if one is not held.[18] The legislative history of § 464(c), as well as policy considerations, however, compel a holding that without a hearing a trusteeship is invalid.

The rationale for such a construction was recently articulated by the Fifth Circuit.[19] The court began by noting that in passing § 464 Congress was extremely concerned with the frequent imposition of trusteeships over subordinate locals for illegitimate purposes. The court then stated:

> Under the common law prior to the passage of the . . . [statute], a trusteeship imposed upon a subordinate body was invalid unless the sub-

---

17. "In any proceeding pursuant to this section a trusteeship . . . authorized or ratified after a fair hearing . . . shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trus- teeship was not established or maintained in good faith for a purpose allowable under section 462 of this title." 29 U.S.C. § 464(c) (1970).

18. *Ibid.*

19. Jolly v. Gorman, 428 F.2d 960 (5th Cir. 1970).

ordinate body was granted a fair hearing. Plentty v. Laborers' Int. Union of No. America, *supra* 302 F. Supp. 332 at 338. Congress was aware of this when it enacted the . . . [statute].

. . . .

The purpose of the trusteeship provisions of the . . . [statute] was to prevent abuses of union trusteeships and to require disclosure of the reasons for union actions in matters touching the governance of local union affairs, and it would be contrary to that purpose to hold that a fair hearing is not *required for authorization or ratification* of a trusteeship over a local union, because to so hold would mean that in an important aspect, a union could more easily impose a trusteeship of a subordinate body after passage of the . . . [statute] than it could before.[20]

We agree with this characterization of § 464's purpose and effect.[21] Both the House and Senate committees that considered the statute observed that prior to its passage "A trusteeship will ordinarily be set aside unless the local is given a fair hearing including notice of the charges and an opportunity to defend."[22] The Reports contained language that made it clear Congress did not wish to diminish the procedural protections afforded an affiliate:

[A trusteeship is presumed valid] only if the trusteeship was instituted in procedural conformity with the constitution and bylaws of the international labor organization and authorized or ratified after a fair hearing either by its executive or other body provided in its constitution. This lim-

itation will encourage the use of fair procedure within the union. . . . [I]f dishonesty or bad faith is proved, the bill provides a direct and effective remedy.[23]

This court will not frustrate the clear intent of Congress by making the remedies available to the Local less effective than they were before Congress acted.

Policy considerations, other than those stated by Congress when it passed § 464, support our conclusion that the Local should be given a fair hearing before the imposition of the trusteeship. As we observed, a hearing would have resolved misapprehensions that democratic procedures had been abrogated. In general it is wise to encourage consultation and negotiation before permitting the use of so drastic a measure as a trusteeship. If the International had been acting in good faith, it would have gained as much by hearing the Local's explanations as would the Local in having an opportunity to give them.

In order for the remedy of a hearing to be as "direct and effective" as possible, it is desirable for it to take place before the imposition of a trusteeship. A hearing would be virtually useless if the parent union could impose a trusteeship and then set a hearing for a year later. The hearing should, if possible, be held prior to trusteeship.

There is no absolute requirement that a hearing be held prior to imposition, since the statute states that a hearing may either "approve or *ratify*" the trusteeship. The possibility of "ratification" implies that under some circumstances a hearing may occur after a trusteeship is imposed. We can imagine extreme emergencies that might compel

20. *Id.* at 967 (emphasis added).

21. Two cases other than Jolly v. Gorman have held that § 464 requires a hearing. *See* Bailey v. Dixon, 429 F.2d 1321 (5th Cir. 1970); Local No. 2, Int'l Bhd. of Tel. Workers v. Int'l Bhd. of Tel. Workers, 261 F.Supp. 433, 435–436 (D.Mass. 1966). *See also* Parks v. Int'l Bhd. of Elec. Workers, 314 F.2d 886, 912 (4th Cir. 1963).

22. Senate Report No. 187, U.S.Code Cong. & Admin.News, 86th Cong., 1st Sess., 1959, Vol. 2 at 2318; House Report No. 741, *id.*, at p. 2424.

23. Senate Report No. 187, note 22, *supra*, at p. 2334; House Report No. 741, note 22, *supra*, at p. 2436.

action without prior notice and hearing. Even in such an emergency situation, however, a hearing date could be set when the trusteeship was imposed and held shortly thereafter. In this case, the International neither made an attempt to hold a hearing prior to imposition nor later.[24]

■ In the facts of this case we see no emergency situation that required action without providing the Local with a fair hearing. The letter to the supervisors indicated that they had not been finally and formally expelled. Even if the vote on the resolution was unfair, arguably there was time for some hearing procedures between the mailing of the ballots and the time the disaffiliation was to become effective. If the International felt it possible to take the considerable trouble to create a trusteeship, it could certainly go one small step further and permit the Local to explain why such an action was unnecessary. The actual course chosen here was summary action by fiat that cannot be justified, particularly where the sole alleged purpose of the trusteeship was to restore union democracy. Under the facts of this case, some sort of prior hearing was both possible and required for the trusteeship to be valid, hence the International had no excuse to flout accepted concepts of due process.

■ For future guidance to unions attempting to abide by the law and courts reviewing union activity, our holding on this point may be summarized as follows. Absent a reasonable belief in the necessity for immediate action, all practical steps must be taken to afford a hearing *before* a trusteeship is imposed. A trusteeship may be imposed without a hearing only where a parent union could reasonably believe that an emergency situation does not allow time for such a hearing. Even in such emergency situations, at the time the trusteeship is imposed a hearing should be scheduled for the earliest practicable date thereafter. If the parent union does not comply with these requirements, any trusteeship will be treated as void *ab initio*.[25]

## V. *Conclusion*

We find that the Local did not in fact violate any democratic procedures in its attempt to disassociate itself from the International. We also find that the trusteeship was not properly imposed, hence had no effect upon the validity of the disaffiliation vote. We therefore reverse the trial court's denial of a permanent injunction and its dismissal of the Local's plea for damages. The case is remanded to the District Court for an order dissolving the trusteeship, enjoining future intervention by the Interna-

24. In the Order revoking the charter of the Local, the International said that the Local could ask for a hearing. Joint App., Vol. III at 533. It is clear, however, that no attempt was made to afford a hearing prior to the imposition of the trusteeship.

25. The formulation we enunciate here is somewhat different from that stated by the Fifth Circuit in Jolly v. Gorman, notes 18–20, *supra,* and accompanying text. In *Jolly* the court considered the issue of when a hearing should be held:
The determination of whether a trusteeship has been authorized or ratified by a fair hearing is necessarily made on a case-by-case basis. For example, under some circumstances, a lapse of eleven months from the time that a trusteeship is imposed to the time that a fair hearing is held and ratification made, may be considered unreasonable and insufficient to fulfill the requirement of a fair hearing to authorize or ratify the imposition of a trusteeship.
428 F.2d at 968, n. 2. This standard was repeated in Bailey v. Dixon, 429 F.2d 1321, 1322 (5th Cir. 1970).
We, of course, agree that the particular facts of a case may be relevant to the disposition; facts suggesting the existence of an emergency may permit the imposition of a trusteeship without prior hearing. Hopefully, the standard we enunciate will give unions a clearer understanding of what is expected of them and will provide a more objective standard for courts to apply when asked to review union action.

tional in Local affairs, for hearings on the amount of damages due the Local, and for any other action deemed appropriate and consistent with this opinion.

So ordered.