LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, Appellant,

v.

NATIONAL POST OFFICE MAIL HANDLERS, WATCHMEN, MESSENGERS AND GROUP LEADERS DIVISION OF THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO and First American Bank, N.A.

LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, Appellant,

v.

NATIONAL POST OFFICE MAIL HANDLERS, WATCHMEN, MESSENGERS AND GROUP LEADERS DIVISION OF THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO National Post Office Mail Handlers Local Unions Nos. 297, et al., Intervenors.

Nos. 89–7013, 89–7049 and 88–7207.

United States Court of Appeals, District of Columbia Circuit.

Argued May 15, 1989.

Decided July 28, 1989.

George Kaufmann, with whom Joseph E. Kolick, Jr., Laurence E. Gold, and Orrin Baird, Washington, D.C., were on the brief, for appellant, Laborers' Intern. Union of North America, AFL–CIO.

William W. Osborne, Jr. and John R. Mooney, Washington, D.C., were on the brief for appellants, Nat. Post Office Mail Handlers Local Union Nos. 301, et al.

Charles R. Both, with whom John F. Colwell and Arthur L. Fox, II, Washington, D.C., were on the brief, for appellee, Nat. Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Div. of the Laborers' Intern. Union of North America, AFL–CIO, and appellees/intervenors Nat. Post Office Mail Handlers Local Unions Nos. 297, et al.

Larry D. Sharp and Thomas P. Murphy, Washington, D.C., entered an appearance for appellee, First American Bank, N.A.

Before MIKVA and WILLIAMS, Circuit Judges, and WILL,* Senior District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

* Senior District Judge Hubert L. Will of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

MIKVA, Circuit Judge:

These consolidated cases arise out of a dispute between an international labor union and its affiliate over the power of the international to impose a supervision or trusteeship on the affiliate. The question presented is whether a federal district judge has the statutory power to enjoin the international union from conducting a hearing that, in the absence of an emergency, is required by its constitution before it may impose a trusteeship on its affiliate. We hold that Title III of the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §§ 462, 464, does not authorize the enjoining of such a pre-trusteeship hearing. In addition, we vacate as moot certain other aspects of the district court's rulings, as required by *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950). All told, we vacate completely the orders of July 28, 1988 and January 17, 1989.

## I. BACKGROUND

On December 16, 1985, the Laborers' International Union of North America, AFL–CIO ("LIUNA") imposed a trusteeship on its affiliate the Mail Handlers, Watchmen, Messengers and Group Leaders Division ("Division"). Louis D. Elesie was appointed trustee of the Division by LIUNA President Angelo Fosco. The trusteeship ended on February 1, 1988, and is the subject of a lawsuit pending before the district court, *see National Post Office Mail Handlers Division v. Laborers' International*, 880 F.2d 1388 (D.D.C.).

On February 1, 1988, a slate of candidates critical of LIUNA was elected to positions of leadership within the Division, including Herbert Walker as president. Almost immediately, according to Walker, the two unions disagreed over the appropriate term of office for the Division's new leaders. LIUNA insisted that the officers elected in February should serve only seven months, to fill out the remainder of the term of the former officials who had been removed by the trusteeship in 1985. The Division's officials replied that they had

been elected to full four-year terms. On March 30, 1988, the Division notified Fosco that it planned to hold a National Conference in August, in order to update and amend its constitution, but advised Fosco that it did not plan to hold new elections at that time.

On June 20, 1988, LIUNA President Angelo Fosco declared an emergency supervision over the Division, claiming that the move was "necessary to correct and guard against corruption and financial malpractice, assure the performance of the Division's collective bargaining agreement and responsibilities, and in general carry out the Division's legitimate objectives." *Laborers' International v. Mail Handlers Division*, 128 L.R.R.M. (BNA) 3178, 3179, 1988 WL 83091 (1988). The supervision was imposed prior to notice and a hearing, pursuant to Article IX, section 7 of LIUNA's constitution, which empowers LIUNA's president to impose a trusteeship or supervision without a hearing when, in his judgment, "an emergency situation exists," *see Laborers' International v. Mail Handlers Division*, 130 L.R.R.M. (BNA) 2426, 2427 n. 3 (1989).

Fosco determined that for several reasons an emergency situation existed in this case. First, he noted that on June 16, 1988, a federal grand jury in Columbus, Ohio, had issued a fifty-count indictment of Herbert Walker, alleging that he had embezzled approximately $100,000 while serving as the president of a Mail Handlers local. Walker later pled guilty to some of the charges, and is currently in prison. Members of the Division's Policy and Steering Committee assert that on the morning of June 20th they resolved informally that Mr. Walker should take a leave of absence and that they should appoint an Acting Director to fill his vacancy. Later that day the emergency supervision was declared. On the evening of the 20th, the Committee adopted a resolution accepting a leave of absence from Walker pending the outcome of his criminal proceeding.

As the second factor justifying the supervision, Fosco asserted that the Division had committed fraud with respect to the

Mail Handlers Health Benefit Plan ("Health Plan"), a government procurement contract between the Division and the federal Office of Personnel Management ("OPM") that provides health insurance to approximately 517,000 federal employees as well as to the 40,000 members of the Division. The Health Plan is underwritten by the CNA Insurance Company. LIUNA contends that Mail Handlers Local No. 300 in New York attempted to force the Health Plan to pressure CNA to pay false and fraudulent claims submitted by a consortium of medical providers known as the Federal Plaza Medical Associates ("Federal Plaza"). The OPM ordered the Health Plan to conduct an audit, which revealed that a number of fraudulent claims had been paid, many during the 26–month period when LIUNA's trusteeship was in effect, *see Laborers' International,* 128 L.R.R.M. at 3183. When OPM instructed CNA to cease payment on questionable claims, Federal Plaza, supported by several Local No. 300 officials, filed suit to force payment. *See Federal Plaza Medical Associates v. Palermino,* No. 87–6777 (S.D.N.Y.). LIUNA charges that instead of protecting the Division against further illegal conduct by Federal Plaza, the affiliate's leadership pressured CNA to pay the disputed sums to Federal Plaza.

As the third factor creating the "emergency," Fosco cited a dispute concerning money paid by the Division to LIUNA for collective bargaining and contract administration costs. LIUNA receives for this purpose $2.75 per Division member per year, and rebates money not spent on bargaining costs. On June 10, 1988, Walker sent Fosco a letter complaining that the Division had been forced to absorb many of LIUNA's bargaining expenses beyond the $2.75 per capita tax, and that LIUNA had overbilled the Division for $664,335.75 since January 1987. The letter advised that if LIUNA believed any of the Division's figures to be incorrect, the Division expected it to discuss and resolve any discrepancies. Walker also stated, "I wish formally to advise you that the Division cannot continue to advance any financial support to LIUNA, particularly if it is unwilling to reimburse the Division." LIUNA maintains that no money is owed to the Division and that Walker's letter failed to subtract all the sums expended by LIUNA as bargaining costs. Fosco cited Walker's threatened cutoff of funds as a factor in creating the emergency that led to the imposition of the supervision.

Fosco installed Louis Elesie as supervisor and ordered him to begin an immediate audit of the Division's finances since the end of the trusteeship on February 1, 1988. Fosco directed the Division to allow Elesie complete access to its financial records, and not to make any expenditures of Division funds without express authorization from Elesie. On June 24, 1988, LIUNA obtained a temporary restraining order from the district court preventing the Division from interfering with the supervision. The Division was restrained from denying Elesie unrestricted access to and control of the books and records of the Division, from violating or impeding any of Elesie's directives, and from executing any checks or otherwise exercising control of its funds.

On July 28, 1988, the district court denied LIUNA's motion for a preliminary injunction for continued judicial enforcement of the supervision, on the ground that Fosco had not had a reasonable basis to believe that an "emergency" existed on June 20. *See Laborers' International,* 128 L.R.R.M. at 3183–84. The district court noted that much of the Federal Plaza fraud occurred while the Division was under LIUNA's trusteeship, and that despite its rhetoric the Division had never failed to pay its per capita tax assessment. The court also reasoned that Walker had been placed on a leave of absence and that the criminal charges against him did not relate to his tenure as National Director. Furthermore, the district judge found that several of LIUNA's officers, including President Fosco, had been indicted in the past, yet none of them had ever offered or been forced to resign. This ruling denying LIUNA's motion for a preliminary injunction is the subject of the appeal in No. 88–7207.

In the meantime, a special LIUNA panel held a hearing from July 13 to 16, 1988,

and afterwards filed a report concluding that "[t]here was an emergency situation requiring supervision" on June 20, and recommending that the supervision imposed by President Fosco on that date be continued. On August 2, 1988, LIUNA's General Executive Board approved the panel's report and voted to impose a supervision on the Division. Elesie has remained active as supervisor, although on August 11 the Division obtained a temporary restraining order that commanded its bank to honor checks signed by Division officials. The Division has continued to submit the check register on a weekly basis to Elesie, and Elesie asserts his authority to disapprove resolutions of the Policy and Steering Committee, although the Division disputes his power to do so.

On September 20, the district court held oral argument on cross-motions asking it to rule on the continued enforceability of the supervision, and to consider the implications of the hearing held by LIUNA's special panel and the vote of the General Executive Board imposing a supervision. On November 14, 1988, the court referred the motions to a special master, who was instructed to submit a report by February 1, 1989. Due to illness, the special master has been delayed and the motions remain pending.

The Division contends that it was forced to postpone a planned constitutional conference from August until November 1988, because Elesie delayed in approving the purchase of necessary supplies, and because he refused to permit outside counsel to be hired to draft proposed amendments. Elesie denies any culpability for the postponement of the conference.

When the meeting was finally held in November, the Division adopted a revised constitution providing for the direct election of national officers by secret ballot. The election was set for January and February 1989. LIUNA maintains that the Division has violated the international constitution (which is binding on the Division as well) by failing to hold an election at the November conference, and by failing to submit the revisions in its constitution to LIUNA's General Executive Board for approval.

By letter of December 8, 1988, Fosco proposed the appointment of a trustee for the Division and called for a hearing on December 20 to determine whether such a trusteeship should be imposed. Fosco listed three factors as justifying this move: (1) the implementation of the Division's constitutional amendments without the prior approval of LIUNA's General Executive Board; (2) the Division's failure to conduct an election under the procedures and within the period mandated by the Division's old constitution; and (3) instances of financial malpractice.

On December 19, the district court granted the Division a temporary restraining order preventing the hearing from being held the next day. On January 17, 1989, the district court preliminarily enjoined LIUNA from conducting the hearing and imposing a trusteeship for for the reasons proffered by Fosco. *See Laborers' International,* 130 L.R.R.M. at 2435. The judge found that LIUNA had acted in bad faith to suppress the Division's bid for autonomy, and that its asserted justifications for the trusteeship were "pretextual and politically motivated," *see id.* at 2434. The court also concluded that holding a hearing in the midst of an election would violate Title I of the LMRDA because if the Division's officers were required to prepare for and attend a lengthy hearing, "they [would be unable] to provide the membership with information about the elections and [would] be prevented from campaigning for themselves in their spare time." *Id.* at 2433. The court therefore enjoined LIUNA "from conducting a hearing for the purpose of considering an imposition of a trusteeship or from imposing a trusteeship" over the Division "unless the hearing or trusteeship is based on grounds other than those set out in the December 8, 1988 letter of General President Fosco." *Id.* at 2435. This ruling is appealed in Nos. 89–7013 and 89–7049.

## II. DISCUSSION

### A. *Mootness*

At the outset we confront the suggestion that changing circumstances have mooted

certain aspects of the district court's orders. We agree, and accordingly vacate those aspects of the decisions, pursuant to *United States v. Munsingwear, Inc.,* 340 U.S. 36, 41, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950); *see also Deakins v. Monaghan,* 484 U.S. 193, 108 S.Ct. 523, 528, 98 L.Ed.2d 529 (1988).

We find that the district court's ruling of July 28, 1988, which denied LIUNA's motion for a preliminary injunction to enforce its emergency supervision over the Division, is now moot. "A case is rendered moot when events so unfold as to preclude the possibility of meaningful relief." *Safe Energy Coalition v. U.S. Nuclear Regulatory Comm'n,* 866 F.2d 1473, 1476 (D.C. Cir.1989). Currently pending before the district court are motions for injunctions by both parties regarding the supervision voted by the General Executive Board on August 2. This vote occurred after LIUNA, as prescribed by Article IX, section 7 of its constitution, held a hearing before a special panel from July 13 to 16, 1988, to determine the need for a supervision. Afterwards the panel filed a report recommending that the supervision imposed by President Fosco on June 20 be continued. *See Laborer's International,* 130 L.R.R.M. at 2427.

If we upheld the district court's decision of July 28, LIUNA would be without an injunction, of course, but it would still be able to file a new motion requesting one—as in fact it has already done. Even if we reversed the district court's decision, we would do no more than remand the case to the district court for further consideration of the matter—as is now occurring. Although we have the raw power to order an injunction if necessary to protect the rights of the parties, *see Charles v. Carey,* 627 F.2d 772, 776 (7th Cir.1980), any relief we might contemplate would have to take into account the passage of time and the existence of the pending motions for injunctions upon which the district court has not yet ruled. "[R]eversal of an order denying a preliminary injunction is customarily accompanied by a directive that the district court conduct a new hearing on remand."

*Patton v. Dole,* 806 F.2d 24, 31 (2d Cir. 1986). The district court is already proceeding on this course. Because subsequent events have rendered irrelevant the district court's decision of July 28, we vacate that decision and instruct the district court to move forward and consider the pending motions. *See Central Kentucky Production Credit Ass'n v. United States,* 846 F.2d 1460, 1464 (D.C.Cir.1988); *Spivey v. Barry,* 665 F.2d 1222, 1234–35 (D.C.Cir. 1981).

In addition, we find moot that aspect of the district court's ruling of January 17, 1989 holding that a pre-trusteeship hearing would unduly disrupt the electoral process and result in violations of rights guaranteed by Title I of the LMDRA. *See Laborers' International,* 130 L.R.R.M. at 2433–34. The election that the district judge sought to protect is now over and cannot provide any continuing reason to enjoin LIUNA from holding a hearing. "The relief sought and granted by the district court has expired on its own terms; there is nothing left for us to review." *Monzillo v. Biller,* 735 F.2d 1456, 1460 (D.C.Cir.1984); *see also Air Line Stewards & Stewardesses Ass'n, Local 550 v. Transport Workers Union,* 334 F.2d 805, 808 (7th Cir.1964), *cert. denied,* 379 U.S. 972, 85 S.Ct. 648, 13 L.Ed.2d 563 (1965) (challenge to trusteeship mooted by trusteeship's termination). Although the Division claims that certain races have been contested and may have to be re-run, this possibility is a "speculative contingenc[y]," *Hall v. Beals,* 396 U.S. 45, 49, 90 S.Ct. 200, 202, 24 L.Ed.2d 214 (1969), that cannot be said to be "sufficiently real and immediate to show an existing controversy." *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). If in the future a proposed hearing threatens to disrupt an election held by the Division, it would be free to file a new action in district court.

### B. *Injunction of Pre–Trusteeship Hearing Under Title III*

The live issue remaining in this case is the power of a district court under Title III of the LMRDA to enjoin a union from

holding a hearing to determine whether to impose a trusteeship. The district court ruled that "[e]ven if there were no election and no prospective Title I violations, the bad faith of LIUNA would justify enjoining the hearing." *Laborers' International,* 130 L.R.R.M. at 2434. While acknowledging that this issue, like other questions surrounding trusteeships, is "relatively unchartered territory," *Sheet Metal Workers Int'l Ass'n v. Lynn,* — U.S. —, 109 S.Ct. 639, 646 n. 9, 102 L.Ed.2d 700 (1989), we find that the statute does not authorize such an injunction, and we accordingly vacate that aspect of the district court's decision of January 17, 1989.

The LMRDA regulates, *inter alia,* the purposes for which a trusteeship can be *"established," "maintained,"* or *"administered,"* §§ 302, 304(c), 29 U.S.C. §§ 462, 464(c) (emphasis added). Judicial review is available "for such relief (including injunctions) as may be appropriate." § 304(a), 29 U.S.C. § 464(a). The implication, if not the plain meaning, of the statute is that an injunction might be used to prevent the establishment of a trusteeship that was imposed in bad faith or for other impermissible purposes. Accordingly, a number of courts have enjoined the imposition of trusteeships pursuant to Title III, *see Retail Clerks Union, Local 770 v. Retail Clerks Int'l Ass'n,* 479 F.2d 54, 55 (9th Cir.1973); *Local 321, Building Serv. Employees' Union v. Sullivan,* 54 Lab.Cas. (CCH) ¶ 11,671, at 18,102 (N.D.Ill.1967); *Daye v. Tobacco Workers International Union,* 234 F.Supp. 815, 818 (D.D.C.1964) (enjoining trusteeship that "was not legitimate within the meaning of" 29 U.S.C. § 462); *see also Davis v. Gober,* 101 L.R. R.M. (BNA) 2719, 2720, 1979 WL 1869 (N.D.Ga.1979) (refusing injunction on ground that no showing of bad faith had been made, but implying that otherwise injunction would be available). This court has noted that a district court has the power to enjoin the reimposition of a trusteeship after its dissolution, *see Local Union 13410, United Mine Workers v. United Mine Workers of America,* 475 F.2d 906, 915–16 (D.C.Cir.1973), and we have noted that a district court has "broad equitable

powers to fashion a suitable remedy" for trusteeship abuses. *Brennan v. United Mine Workers,* 475 F.2d 1293, 1296 (D.C. Cir.1973) (*per curiam*).

This does not mean, however, that a district court has the power to enjoin a *hearing* that under a union constitution is required, in the absence of an emergency, before a trusteeship may be declared. A hearing itself does not constitute the "establishment" of a trusteeship; rather, it is an internal union proceeding that may or may not lead to a trusteeship. In this case, LIUNA's president had merely *recommended* a trusteeship and called for a hearing. It was up to the General Executive Board to decide whether or not to impose a trusteeship. LIUNA's constitution provides:

> prior to the appointment of [a] trustee or supervisor [the president] shall cause to be issued a notice setting a time and place for hearing *for the purpose of determining whether such temporary trustee or supervisor shall be appointed * * *.*

Article IX, section 7, as quoted in *Laborers' International,* 128 L.R.R.M. at 3181 (emphasis added).

In the absence of exceptional circumstances, Title III contemplates judicial review of the trusteeship order itself, rather than review of a decision to hold a hearing. The statute regulates only the establishment, maintenance, or administration of a "trusteeship," which it defines as a method of control "whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws." § 3(h), 29 U.S.C. § 402(h). A hearing by an international union to determine whether to establish a trusteeship does not "suspend" its affiliate's autonomy and does not itself constitute a trusteeship. "[T]he statutory scheme * * * clearly evidences an expectation that disputes over trusteeships would be litigated with the trusteeship in effect." *National Association of Letter Carriers v. Sombrotto,* 449 F.2d 915, 921 (2d Cir.1971) (Friendly, J.).

The legislative history of the LMRDA shows that Congress was concerned pri-

marily with the actual imposition of trusteeships and supplies no evidence that the statute was intended to provide authority to enjoin pre-trusteeship hearings. The Senate Select Committee on Improper Activities in the Labor or Management Field (known as the "McClellan Committee") catalogued a litany of abuses of trusteeship authority that later became the target of the LMRDA:

(a) Some trusteeships have been baselessly *imposed.*

(b) Some have *lasted* for as long as 30 years.

(c) Rank-and-file efforts to *throw-off* such shackles have been ignored, rejected, and sometimes met with violence and intimidation.

(d) Locals *under trusteeship* have been plundered by the very officials entrusted with the management of their affairs.

(e) Locals *under trusteeship* have been used as pawns in political battles within international unions, often in order to boost the ambitions of particular candidates for high office.

S.Rep. No. 1417, 85th Cong., 2d Sess. 4 (1958). Significantly, these problems pertain only to *existing* trusteeships. In the same vein, the House and Senate reports accompanying the final version of the bill stated that it "[a]uthorize[d] Federal court proceedings to *dissolve* trusteeships when not imposed in accordance with the provisions of this bill," S.Rep. No. 187, 86th Cong., 1st Sess. 3 (1959) (emphasis added); H.R.Rep. No. 741, 86th Cong., 1st Sess. 3 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2318, 2319, 2425 (same). The reports also refer to legal actions "staying or upsetting trusteeships," the power to file suit in district courts against "improper trusteeships," and the preservation of the right of a local union "to challenge a trusteeship in the State courts," S.Rep. No. 187 at 17, 19; H.R.Rep. No. 741 at 13, 15, U.S.Code Cong. & Admin.News 1959, pp. 2333, 2336, 2436, 2438. This language implies that injunctions are available against trusteeships themselves but not against pre-trusteeship hearings.

■ Another feature of the LMRDA confirms our interpretation of Title III. Union constitutions are "contracts" within the meaning of section 301(a) of the Taft–Hartley Act, 29 U.S.C. § 185(a), *see Plumbers & Pipefitters v. Local 334,* 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981), and by enjoining a union from holding a pre-trusteeship hearing in accordance with its own constitution and bylaws, a court overrides the contractual rights of the union to hold such a hearing. *Cf. International Bhd. of Boilermakers v. Local Lodge 714,* 845 F.2d 687, 691 (7th Cir.1988) (contractual right to impose trusteeship). The LMRDA was not intended to permit courts to rewrite union constitutions or to "prescribe detailed procedures and standards for the conduct of union business." S.Rep. No. 187, 86th Cong., 1st Sess. 7, U.S.Code Cong. & Admin.News 1959, p. 2323 (1959). Instead, Congress "recognized the desirability of minimum interference by Government in the internal affairs" of labor unions. *Id.* Not surprisingly, the Division has cited no case, and we have discovered none, recognizing the power of a district judge to enjoin a pre-trusteeship hearing under Title III.

■ Our reading of Title III does not eliminate the incentive of parent unions to hold hearings in good faith. Congress provided in section 304(c) of the LMRDA, 29 U.S.C. § 464(c), that a presumption of validity would attach only to trusteeships declared after a "fair hearing," and the Committee reports noted that "[t]his limitation will encourage the use of fair procedure within the union." S.Rep. No. 187 at 18; H.R.Rep. No. 741 at 14, U.S.Code Cong. & Admin.News 1959, pp. 2334, 2436. In addition, section 302, 29 U.S.C. § 462, requires unions whose constitutions so provide to hold impartial hearings before imposing trusteeships. This court has previously held that "[a]bsent a reasonable belief in the necessity for immediate action, all practical steps must be taken to hold a hearing *before* a trusteeship is imposed" and that any such hearing must be a "fair" one. *Local Union 13410,* 475 F.2d at 914, 915 (emphasis in original); *see also Jolly v. Gorman,* 428 F.2d 960, 966–68 (5th Cir.

1970), *cert. denied,* 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635 (1971); S.Rep. No. 187 at 17 (recognizing common-law rule that "[a] trusteeship will ordinarily be set aside unless the local is given a fair hearing including notice of the charges and an opportunity to defend."); H.R.Rep. No. 741 at 13, U.S.Code Cong. & Admin.News 1959, pp. 2333, 2436 (same). Hence, even though a union may not be ordered, *ex ante,* to hold a fair hearing or refrain from holding one in bad faith, unions that fail to hold fair hearings will lose, *ex post,* the advantage of the presumption embodied in section 304(c) and may be disqualified from imposing a trusteeship altogether. *See* Note, *Landrum–Griffin and the Trusteeship Imbroglio,* 71 Yale L.J. 1460, 1504–05 (1962) (predicting that these factors will encourage unions to hold fair hearings).

It might be objected that the district court's order in the case *sub judice* enjoined not merely the hearing alone but also the establishment of the trusteeship itself, *see Laborers' International,* 130 L.R.R.M. at 2435, and that the order could be upheld at least in part on that basis. However, while Title III permits a district court to enjoin the imposition of a trusteeship in some circumstances, in the instant case the court below did not find that the declaration of a trusteeship was either likely or irreparable, *see id.* at 2435. This is understandable in light of the fact that President Fosco did not propose to establish a trusteeship until after a hearing was held, a process that in 1985 required several weeks to complete, *see id.* at 2433. The district court restricted its discussion to the injury represented by a *hearing, see id.* at 2435, and did not consider whether the prospect of a *trusteeship* was sufficiently immediate to satisfy the traditional test for an injunction. *See Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985) (*per curiam*). Accordingly, the portion of the order forbidding establishment of a trusteeship cannot stand.

Because we find that the district court's order was without statutory basis, we have no occasion to pass on its factual findings. Similarly, because the election has already been held, we do not decide whether a district court has the power to enjoin a pre-trusteeship hearing under Title I of the LMRDA. We express no view on the motions currently pending before the district court.

For the reasons stated, the orders of July 28, 1988, and January 17, 1989 are *Vacated.*